NOTICE
Decision filed 08/08/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230271-U

NO. 5-23-0271

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| CONCERNED CITIZENS & PROPERTY OWNERS; ILLINOIS AGRICULTURAL ASSOCIATION, a/k/a Illinois Farm Bureau; CONCERNED PEOPLE ALLIANCE; NAFSICA ZOTOS; and YORK TOWNSHIP IRRIGATORS, | ) ) ) ) ) ) | Appeal from the Illinois Commerce Commission. |
| Petitioners-Appellants, | ) ) ) | |
| v. | ) ) | ICC Docket No. 22-0499 |
| ILLINOIS COMMERCE COMMISSION; GRAIN BELT EXPRESS CLEAN LINE LLC; CLEAN GRID ALLIANCE; HANSON AGGREGATES MIDWEST, INC.; GREYROCK, LLC; CITIZENS UTILITY BOARD; LEONARD BRAD DAUGHERTY, as Trustee of the Leonard Daughtery Trust Dated July 9, 2010; REX ENCORE FARMS LLC; and ILLINOIS MANUFACTURERS ASSOCIATION, | ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents-Appellees. | ) | |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Barberis and McHaney concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The Illinois Commerce Commission's granting of a CPCN to a company seeking to build an interstate high voltage direct current transmission line was against the manifest weight of the evidence where the company failed to prove the required criteria that it is capable of financing the project.

¶ 2  The petitioners, Concerned Citizens & Property Owners, *et al.*, are appealing the Illinois

Commerce Commission's (Commission) granting of Grain Belt Express, L.L.C. (GBX) a

1

certificate of public convenience and necessity (CPCN) pursuant to sections 8-406(b-5), 8-406.1, and 8-503 of the Public Utilities Act (Act) (220 ILCS 5/8-406(b-5), 8-406.1, 8-503 (West 2022)) (Final Order) on March 8, 2023. It is the contention of the petitioners on appeal that, *inter alia*, the Commission improperly found that GBX proved the elements necessary for issuance of a CPCN, that the Commission misinterpreted the newly enacted section 8-406(b-5), and that section 8-406(b-5) is unconstitutional. For the following reasons, we reverse the Commission's Final Order granting GBX a CPCN.

¶ 3                                    I. BACKGROUND

¶ 4       This is not GBX's first time seeking a CPCN in Illinois. On April 10, 2015, GBX, then known as Grain Belt Express Clean Line, LLC, filed an application with the Commission pursuant to section 8-406.1 for a CPCN to construct, operate, and maintain a high voltage direct current (HVDC) transmission line and to operate a transmission public utility business, and to construct the transmission line pursuant to section 8-503. At the time of that application, GBX was owned by a different parent company. The transmission line proposed in the 2015 application was substantially similar to that for which GBX seeks a CPCN in this matter.

¶ 5       On November 12, 2015, after the review of evidence and a hearing, the Commission granted GBX the CPCN for the proposed transmission line. Subsequently, the intervenors in that matter, many of which are the same here, sought review of the 2015 order through an appeal filed with this court. On April 17, 2018, in *Concerned Citizens & Property Owners v. Illinois Commerce Comm'n*, 2018 IL App (5th) 150551, we reversed the 2015 order (and the CPCN granted thereunder) on the basis that GBX was not a "public utility," which we deemed a prerequisite to obtaining a CPCN under the Act. Specifically, we relied on the supreme court decision in *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2017 IL 121302, which had addressed

2

a similarly proposed HVDC transmission line project in another part of the state, which was being operated by GBX's sister company, Rock Island Clean Line, LLC. We found that because GBX did not own, control, operate, or manage, within this state, directly or indirectly, for "public use," any plant, equipment or property to be used for or in connection with the transmission of electricity at the time of its application, it could not meet the definition of "public utility" under section 3-105(a) of the Act.

¶ 6 After the Illinois Supreme Court and this court rejected the proposed projects for Rock Island and GBX, the parent organization of GBX sold the company to Invenergy Transmission, a company based in Chicago, Illinois, via a membership interest purchase agreement dated November 9, 2018. Rather than change its business plan or proposed project to comply with the Act, GBX set out to change the law and have new legislation enacted which would allow it to benefit from the Act in the same way a traditional "public utility" would benefit. GBX lobbied the Illinois legislature for the changes to the Act set forth in section 8-406(b-5). In response to the previously noted court decisions and after being lobbied by GBX and its parent company, Invenergy, in 2021, the Illinois General Assembly enacted Public Act 102-0662, the Climate and Equitable Jobs Act (CEJA), which became effective September 15, 2021. The CEJA amended 17 separate acts. Relevant to this appeal is section 8-406(b-5), which modified the Act. In short, section 8-406(b-5), *inter alia*, created a new category of applicant eligible for a CPCN. Section 8-406(b-5) authorized a "qualifying direct current applicant" (QDCA) to file for and obtain a CPCN to construct, operate and maintain a "qualifying direct current project" (QDCP) without owning, controlling, operating, or managing any plant, equipment or property in Illinois at the time of the application filing or the issuance of the Commission order.

¶ 7    On July 26, 2022, GBX filed an application with the Commission seeking a CPCN pursuant to sections 8-406(b-5) and 8-406.1 of the Act. In its application, GBX sought to construct, operate, and maintain the Illinois portion of a HVDC transmission line and related facilities and to conduct a transmission public utility business in connection therewith. GBX also sought pursuant to sections 8-503 and 8-406.1(i) an order authorizing it to construct the transmission line and related facilities. GBX filed the application as a QDCA and the project as a QDCP under the newly enacted section 8-406(b-5). The application was accompanied by the prepared direct testimony and exhibits of 11 witnesses on behalf of GBX.

¶ 8    No parties to this appeal contend that the GBX or its project do not meet the definition of a QDCA or QDCP as outlined in section 8-406(b-5). The project is an interstate project which will originate in Ford County, Kansas, then traverse the remainder of Kansas into Missouri, cross Missouri into Illinois, travel approximately 207 miles through Pike, Scott, Greene, Macoupin, Montogomery, Christian, Shelby, Cumberland, and Clark Counties, where it will ultimately, cross into Indiana. The transmission line's approximate length is expected to be 800 miles and interconnect multiple regional electric grids including Southwest Power Pool (SPP), Midcontinent Independent System Operator (MISO), Associated Electrical Cooperative, Inc. (AECI), and PJM Interconnection, LLC (PJM). The origination point in Kansas is a planned, but not yet constructed, windmill farm and possible other renewable energy projects which will supply the "clean energy" that will then be transmitted in bulk over the HVCD transmission lines.

¶ 9    GBX states that it intends to construct the project in two phases. Phase I will comprise the portion of the transmission line starting in Ford County, Kansas, and ending at the points of interconnection in Missouri. Phase 2 is anticipated to comprise the portion of line starting at the

4

converter station in Missouri, traveling through Illinois, and ending at the AEP Sullivan Substation in Sullivan County, Indiana.

¶ 10    Regarding project funding, as a merchant transmission company (in contrast to legacy electric utilities) GBX and Invenergy has indicated they will not finance infrastructure costs through ratepayers in the form of tariffs, but instead GBX plans to utilize a "project finance basis" to build this infrastructure in two separate phases as discussed above, drawing on alleged significant market demand for renewable energy infrastructure. GBX and Invenergy have also indicated on the record that they will not seek regional cost allocation to retail customers using the transmission cost allocation process of PJM or MISO.

¶ 11    GBX and Invenergy contend that when the project reaches an advanced stage of development, GBX will enter into project-specific financing arrangements with investors and lenders to secure the financing necessary to complete the project. They contend that this is typical of projects of this type. In light of the foregoing, the Commission adopted a Revised Financing Condition, which prohibits GBX from "install[ing] transmission facilities for Phase II [including Illinois infrastructure] of the Project on easement property until such time as [GBX] has obtained commitments for funds in a total amount sufficient to finance the anticipated total project cost."

¶ 12    Ultimately, the Commission, after reviewing witness testimony and exhibits, issued its March 8, 2023, order. Relevant to this disposition, the Commission made the following findings after a hearing and reviewing dozens of witness testimony and exhibits.

¶ 13    The Commission determined that GBX "is a qualifying direct current applicant [QDCA]" and the project "is a qualifying direct current project [QDCP] as defined in Section 8-406(b-5) of the Act." As GBX was seeking a CPCN pursuant to sections 8-406(b-5) and 8-406.1, the

5

Commission found that GBX "does not need to request authorization under Section 8-406(a) of the Act."

¶ 14    The Commission found that "the proposed transmission project has a capacity of at least 1,000 MW and a minimum voltage level of 345kV, [thus,] Sections 8-406(b) and 8-406.1(f)(1) are deemed satisfied" under the criteria mandated by section 8-406(b-5). Further, the Commission found that section 8-406.1(f)(1) was satisfied by this showing "without requiring any additional evidence" under section 8-406(b-5).

¶ 15    The Commission then addressed the specific criteria of section 8-406.1(f)(1)-(3). It held that (f)(1) was satisfied by record evidence in that GBX "has demonstrated that there is a need to address a lack of adequate transmission service to move electricity from the resource area of western Kansas to the MISO and PJM markets, including Illinois," and that the project would provide substantial reliability and resiliency benefits by interconnecting these regions, including benefits for Illinois residents. It also found that the project would provide efficient electric transmission service and was the least-cost means of doing so, compared with other transmission alternatives reviewed in the record, including alternating current (AC) configurations.

¶ 16    The Commission found that section 8-406.1(f)(2) was satisfied and no parties challenged or took issue with this portion of the Commission's Final Order.

¶ 17    The Commission then turned to the (f)(3) requirement and found GBX "capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers." It drew on the evidence of GBX's plan to use a "project financing approach." On this point, the Commission credited GBX and Staff testimony "that the project financing approach is commonly used in the energy and infrastructure industries," and noted there "is ample evidence of the need for the project and the interest of renewable energy developers to

support the conclusion that [GBX] will be able to enter into sufficient transmission contracts to support the project financing."

¶ 18    The Commission then addressed its adoption of a Revised Financing Condition and its place within the statutory criteria of section 8-406.1(f)(3), the Commission stated:

"The Commission concurs with Staff that with [GBX] agreeing to be bound by the Revised Financing Condition, the Applicant has satisfied this section of the statute. Section 8-406.1(f)(3) must be considered in its entirety: that the applicant 'is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers.' The Commission notes that the applicant must be capable of raising the necessary capital without adverse financial consequences. The Commission points out that this type of financing condition has been approved by the Commission in the past. The Revised Financing Condition prevents adverse financial consequences, specifically, that [GBX] would commence construction but be unable to complete it due to insufficient funding. If [GBX] were unable to satisfy the Revised Financing Condition and therefore fails to construct the project, the only parties experiencing adverse financial consequences would be [GBX] investors. The Commission notes GBX's commitment that if the Project is terminated, all easements that have been acquired will be released."

Thus, in light of the Revised Financing Condition, it found the section 8-406.1(f)(3) requirement satisfied.

¶ 19    The Commission noted GBX's commitment to not recoup costs through regional transmission organization cost allocation processes as typically would be done by public utilities or other ratepayer recovery mechanisms, but instead through charges to the transmission service customers. The Commission adopted a "Cost Allocation Condition" which requires GBX to notify

7

the Commission if it ever seeks cost allocation from Illinois ratepayers. The Commission referenced its "authority to enforce the Cost Allocation Condition" as part of its "continuing jurisdiction over any CPCN that is granted and [thus] within the authority of the Commission, it may rescind a CPCN if a change in facts or circumstances warrants rescission."

¶ 20 The Commission also addressed the terms of section 8-406.1(i), which it determined mandated that if the Commission granted a CPCN to a qualified applicant, it is required to include an order pursuant to section 8-503 of the Act authorizing or directing the construction of the HVDC line and related facilities as approved by the Commission and " 'in the manner and within the time specified in said [o]rder' " (quoting 220 ILCS 5/8-406.1(i) (West 2022)). On this basis, it granted GBX authority to construct the project in accordance with the conditions and requirements adopted in the order and "with construction on the Illinois portion of the Project to commence within five years (60 months) following the date of the Commission's Order," unless later modified.

¶ 21 Finally, the Commission declined to consider any of the constitutional claims as beyond the scope of its Act subject matter jurisdiction. Following the entry of the order, this timely direct appeal followed. Additional facts are recited below where relevant to our analysis.

¶ 22                                    II. ANALYSIS

¶ 23 The petitioners raise several issues in this appeal including challenging the constitutionality of section 8-406(b-5) and its interpretation by the Commission. Our supreme court has set in place and continuously reaffirmed the long-standing rule that "cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort." (Internal quotation marks omitted.) *People v. Hampton*, 225 Ill. 2d 238, 243 (2007). Thus, we turn first to those issues raised by the petitioners that do not touch upon the constitutionality or construction of section 8-406(b-5).

¶ 24    The parties involved in this litigation, including the Commission, agree on very little about how this new legislation operates within the context of the Act and whether its goals are even aligned with the Act's purpose. However, there is one thing that everyone does agree upon: that in order for GBX to receive a CPCN, GBX must meet certain criteria as outlined in section 8-406.1. So, we turn to that portion of the Commission's determinations first.

¶ 25    Specifically, *inter alia*, the petitioners take issue with the Commission's finding that GBX met its burden of proving that it is capable of financing the project as required under section 8-406.1(f)(3). 220 ILCS 5/8-406.1(f)(3) (West 2022). The petitioners also take issue with other portions of section 8-406.1 and 8-406(a) not being properly fulfilled by GBX; however, the Commission and respondents contend that those issues raised (that GBX failed to seek status as a "public utility" pursuant to section 8-406(a); whether section 8-406(b-5) eliminated the requirement that it make specific finding that the project promotes the public convenience and necessity; and/or provides a benefit to Illinois ratepayers) must be viewed in light of the new section 8-406(b-5) which assumes those requirements are met and no further evidence is necessary once a QDCA and QDCP are established. Because those arguments require interpretation of section 8-406(b-5) and its impact upon the Act, we reserve our ruling on those as discussed above to be reviewed only if other nonconstitutional matters are not dispositive. Thus, we first turn our attention to the issue of whether the Commission properly determined that GBX met the financing requirement articulated in section 406.1(f)(3). We find that it did not, and we find our determination on that issue is dispositive.

¶ 26    First, we consider our standard of review. In reviewing the Commission's findings, pursuant to section 10-201(e)(iv), a court "may only reverse a Commission order if [it] conclude[s] that '[t]he findings of the Commission are not supported by substantial evidence based on the

9

entire record of evidence presented to or before the Commission.' " *Illinois Power Co. v. Illinois Commerce Comm'n*, 382 Ill. App. 3d 195, 201 (2008) (quoting 220 ILCS 5/10-201(e)(iv) (West 2002)). "Substantial evidence consists of evidence a reasoning mind would accept as sufficient to support the challenged finding; it is more than a scintilla of evidence but requires something less than a preponderance of the evidence." (Internal quotation marks omitted.) *Adams County Property Owners & Tenant Farmers v. Illinois Commerce Comm'n*, 2015 IL App (4th) 130907, ¶ 30. In other words, issues relative to the findings of the Commission are reviewed on a manifest weight of the evidence standard. *Northern Moraine Wastewater Reclamation District v. Illinois Commerce Comm'n*, 392 Ill. App. 3d 542, 556 (2009). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350-51 (2006). "A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Id.*

¶ 27     Now, turning to our analysis and as previously noted, the Commission found that section 8-406(b-5) removes several issues from its discretion and consideration because it was designed to simplify the process for GBX (a non-public utility) to obtain a CPCN for this project. However, everyone agrees that one of the criteria that was unchanged by the new legislation was the requirement that GBX demonstrate pursuant to section 8-406.1(f)(3) that it "is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers." 220 ILCS 5/8-406.1(f)(3).

¶ 28     Unfortunately, the record demonstrates that GBX failed to provide any evidence to meet the burden required by section 8-406.1(f)(3). To satisfy section 8-406.1(f)(3), the applicant must

show that it *is capable* of financing the construction of the proposed project. Therefore, GBX must prove that it has the capacity to finance the project prior to the Commission granting any CPCN. Stated differently, the applicant's capability of financing the project is a condition precedent to the Commission's issuance of a CPCN.

¶ 29    While appearing before the Commission, GBX did not claim that it had the capability of funding the project. Instead, GBX claimed that *it expects* to be able to obtain financing for the project once customer contracts are executed, supply agreements are executed, and site control is obtained in the future. But in addition to this, it also plans on heavily relying upon debt financing. It calls this method of speculative financing, the "project financing approach." GBX stated that it anticipates financing approximately 65% to 80% of the project through debt, with the debt being funded largely through the Department of Energy grants or commercial banks. However, at the time of the Commission's decision, GBX had no customers for the project, no commitments from any financial institution, and had not been awarded any funding or debt commitments from the Department of Energy to provide financing for the project. What is even more concerning is that the wind farm and renewable projects in Kansas, for which this transmission line is supposedly necessary in order to distribute the "clean energy" these projects will produce and deliver to Illinois, do not exist. Quite simply, the projects had not been constructed at the time of the Commission's Final Order, and no evidence was put forth indicating that any commitments, contracts, or construction bids had been obtained or negotiated.

¶ 30    We recognize that GBX witnesses and Commission Staff gave testimony "that the project financing approach is commonly used in the energy and infrastructure industries." However, GBX's simple plan of obtaining financing in the future after it enters into customer agreements, with unknown parties and unknown terms, with no certainty or commitments from any potential

11

customers or lenders does not satisfy the current financing capability criteria of section 8-406.1(f)(3). We note that the sister project in Northern Illinois which was overseen by Rock Island has allegedly been abandoned despite the contentions of GBX before the Commission of the necessity and market demand for such a project. Thus, GBX has not offered any evidence that it "is capable" of funding the project; it instead has only offered evidence of a future, and highly speculative, plan of possibly funding the project. It simply asked the Commission to broadly speculate, and to trust that many unknown variables will fall into place. It does not contend, "let us build it and they will come," but instead, "give us approval, then we will finance it, and then we will build it." This falls short of proving the financing capability required.

¶ 31   Additionally, we recognize that GBX argues its parent company, Invenergy, will provide funding for the project until the expected future financing is secured. GBX contended that Invenergy Renewables Holdings is "an operating company with billions of dollars in assets" that has already invested $60 million and has the ability to finance the project to a stage of viability. However, GBX failed to introduce any evidence, not even a balance sheet, to establish the financial health of either GBX or Invenergy Renewables Holdings.

¶ 32   GBX witness Rolanda Shine confirmed that Invenergy Renewables Holdings maintains financial documents such as annual profit and loss statement, a balance sheet, and a cash flow statement that would demonstrate the financial health of Invenergy and GBX as of December 31, 2021, but said financial evidence was not submitted by GBX in the underlying matter. Instead, GBX asked the Commission to simply take its word, and trust that it had the funding and financial stability it alleges. However, GBX has the burden of proof on that matter. The respondents argue that GBX's witnesses were available for cross-examination, and thus, imply that we should construe that against the petitioners and suggest that fact somehow relieves GBX from its burden.

However, "[t]here is no presumption against a defendant for failure to call witnesses, when the plaintiff, carrying the burden of proof, has not made a *prima facie* case, and such presumption cannot be used to relieve the plaintiff from the burden of proving his case." *Beery v. Breed*, 311 Ill. App. 469, 475 (1941). Moreover, GBX argues in its brief that

> "evidence of financial documents would only be cumulative to the evidence of Invenergy Renewable Holdings' commitment to the Project. A reasonably prudent person would not have produced such redundant evidence even if it benefited him. GBX, part of a privately held group of companies, had a reasonable basis for not providing the evidence. *Tuttle v. Fruehauf Corp.*, 122 Ill. App. 3d 835, 843 (1st Dist. 1987)."

¶ 33    This argument is not well-taken. GBX is seeking to obtain a CPCN through a process that, up until the passage of section 8-406(b-5), was restricted to "public utilities" that owned certain assets in Illinois. GBX seeks to benefit from the Act and CPCN advantages, as a private company. That is not an excuse to protect or hide its, or Invenergy's, balance sheets which would indisputably prove that what GBX is contending is true. The petitioners do not have access to this information and cannot therefore prove a negative.

¶ 34    Ultimately, there was no showing that GBX as it was situated at the time of the Commission's hearing and decisions was financially able to finance and construct the project. In fact, GBX acknowledged before the Commission that it had no customers for the project, had secured no bank commitments, no Department of Energy commitments, etc. It asked the Commission to speculate as to its future capability, and the Commission improperly obliged.

¶ 35    In further support of our finding that GBX failed to prove it was capable of financing the project, the Commission added a unique condition when it made its determination regarding section 8-406.1(f)(3) titled, "Revised Financing Condition" (RFC). According to the Commission,

13

the RFC was adopted to ensure that the project "is adequately financed and facilitates the merchant model with only investor money at risk." The RFC prevents GBX from constructing any facilities or infrastructure in Illinois prior to the project being fully funded. Essentially, it appears to this court that the Commission recognized the speculative nature and the current inability of GBX to finance the project, and instead of properly denying the CPCN as required by the Act, it incorporated the RFC to attempt to extend to GBX more time to prove its capability to finance the project at a later date after a CPCN has already been issued.

¶ 36    The Commission all but concedes its own error in its order. When discussing the RFC and finding that GBX proved it was capable of financing the project, it stated, "The Commission concurs with Staff *that with* [*GBX*] *agreeing to be bound by the Revised Financing Condition, the Applicant has satisfied this section of the statute*." (Emphasis added.) In other words, without the RFC, GBX did not adequately prove its capability to finance the project. However, the capability must be proven prior to a CPCN being issued, not after.

¶ 37    In its brief, the Commission attempts to argue that the RFC merely acts as an added layer of protection for the landowners from GBX commencing construction without adequate financing. The petitioners argue that this condition merely allows GBX to obtain a CPCN prematurely and place a cloud on the titles to their land. The Commission responds that this " 'cloud on the titles to their lands' is purely speculative and not supported by any evidence." However, we do not find it to be any more speculative than GBX's prospects of obtaining commitments from the Department of Energy or entering into contracts with customers prior to completion of the project. Especially, when the "clean energy" projects that are going to produce the energy have not even been built in Kansas. This simply is a classic case of putting the cart before the horse.

14

¶ 38    Ultimately, there was not substantial evidence put forth to support the Commission's finding that GBX is capable of financing the project. The evidence put forward demonstrated that GBX lacked the funding at the time of the hearing, had no customers, contracts, government or bank commitments, and as a result failed to meet the (f)(3) criteria with anything more than speculation. The failure to satisfy the section 8-406.1(f)(3) requirement means that GBX has not carried its burden and has not met the condition precedent necessary to obtaining a CPCN. 220 ILCS 5/8-406.1(f)(3). Therefore, the Final Order entered by the Commission finding otherwise was made in error and requires reversal.

¶ 39    Because of GBX's failure to prove this required element and a CPCN cannot be issued without it, we need not address the other raised issues raised by the petitioners.

¶ 40    Finally, we note that the respondents have filed a joint motion to strike certain portions of the petitioner Nafsica Zotos's reply brief as improper. The portions complained of do not directly address or impact the issue analyzed above which was required for disposition of this appeal. Thus, because the complained portions are not relevant to our disposition of this matter, we deny the motion to strike.

¶ 41                                III. CONCLUSION

¶ 42    For the foregoing reasons, we reverse the Commission's March 8, 2023, order granting GBX a CPCN pursuant to section 8-406(b-5) and other related provisions.


¶ 43    Reversed.