**2026 IL 131026**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket Nos. 131026, 131032)

CONCERNED CITIZENS & PROPERTY OWNERS *et al.*, Appellees, v.
THE ILLINOIS COMMERCE COMMISSION *et al.*, Appellants.

*Opinion filed January 23, 2026.*

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.

Chief Justice Neville and Justices Theis, Overstreet, Cunningham, and Rochford concurred in the judgment and opinion.

Justice Holder White took no part in the decision.

**OPINION**

¶ 1      Respondent the Illinois Commerce Commission (ICC) granted a certificate of public convenience and necessity (CPCN) to appellant Grain Belt Express, LLC (GBX), to construct and operate a high-voltage direct current (HVDC) transmission line over the objection of intervenors Concerned Citizens & Property Owners; the

Illinois Agricultural Association, also known as the Illinois Farm Bureau; Concerned People Alliance; Nafsica Zotos; and York Township Irrigators (collectively Concerned Citizens), who joined the agency proceedings. At issue is whether GBX satisfied the requirement in the Public Utilities Act (Act) that GBX "is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers" to be issued a CPCN. 220 ILCS 5/8-406.1(f)(3) (West 2022). We find that it did and that a showing of current and present capability is not a condition precedent to the issuance of a CPCN.

¶ 2                               BACKGROUND

¶ 3        GBX sought a CPCN from the ICC to construct and operate an HVDC transmission line originating at wind generating facilities in Kansas, traveling through Missouri and transversing nine southern Illinois counties, and ending at an electricity substation in Indiana. GBX filed its application under sections 8-406(b-5) and 8-406.1 of the Act (*id.* §§ 8-406(b-5), 8-406.1). Concerned Citizens intervened in the ICC proceedings to challenge GBX's application based on what it alleged was GBX's lack of compliance with the statutory requirements, including section 8-406.1(f)(3) (*id.* § 8-406.1(f)(3)) and the unconstitutionality of the statute. Clean Grid Alliance; Hanson Aggregates Midwest, Inc.; Greyrock, LLC; the Citizens Utility Board (CUB); Leonard Brad Daugherty, as trustee of the Leonard Daugherty Trust, Dated July 9, 2010; Rex Encore Farms, LLC; and the Illinois Manufacturers Association also intervened in support of GBX's application.

¶ 4        GBX's HVDC transmission line project is designed to deliver energy to buyers in Missouri, Indiana, and Illinois and to other states within the Midcontinent Independent System Operator (MISO) and PJM Interconnection LLC (PJM) grids through the grids' existing infrastructures. GBX included with its application witness testimony and other supporting exhibits and submitted additional testimony at a hearing before the ICC. GBX presented the following evidence. GBX is a wholly owned subsidiary of Invenergy Transmission, LLC, which is an affiliate company of Invenergy Renewables, LLC. Invenergy Transmission created GBX as a special purpose entity to construct, own, and operate the instant project without assets, debt, or liabilities. Cost recovery would come through sales, leases, and agreements with transmission service customers. GBX would not finance or

recover its infrastructure costs from Illinois ratepayers. The project is a merchant transmission project with GBX and its investors assuming all market risk.

¶ 5    GBX had secured regulatory approvals from Missouri, Kansas, and Indiana before it filed its application for a CPCN in Illinois. It would fund construction of the project using the "project finance" method, which is typically used in the energy infrastructure industry. That method of financing involves GBX entering into long-term contracts and commercial agreements with customers for transmission capacity once preliminary development and regulatory permitting are completed. With those contracts as security, GBX will execute project-specific financing with lenders and investors. Under the project finance model, lenders and investors generally require that project developers have the necessary permits and approvals in place, have secured financing commitments beyond the lenders' funding, and have a high degree of certainty on the project's budget and timeline before they will financially commit to the project. GBX's financing will depend on finding transmission service customers who will pay charges for the service.

¶ 6    The initial total cost for constructing the project was estimated at $4.95 billion, with $1.4 billion for construction of the Illinois segment of the transmission line. The revised cost estimate was closer to $6.5 billion and does not include any network upgrades. GBX would finance 65% to 80% through debt with loans from commercial banks and the United States Department of Energy. The rest would be raised from equity investors, including investments from Invenergy Renewables and its affiliates, which, according to witness testimony, have capital resources to undertake initial development and permitting, including $60 million Invenergy Renewables has already spent on development costs. No profit and loss statements, financial statements, or *pro forma* statements were submitted by GBX. Invenergy enjoys long-term successful relationships with various commercial lenders to whom GBX would turn for loan financing, including Wells Fargo, MUFG, GE Capital, JP Morgan, Santander, Morgan Stanley, Natixis, Bank of America, and Rabobank.

¶ 7    Shashank Sane, vice president of transmission for Invenergy, LLC, and GBX, and Rolanda Shine, director of finance for Invenergy, LLC, testified about their experience, and that of GBX, in financing the construction of large-scale energy projects. According to Sane,

"Invenergy Transmission and its affiliate companies have developed transmission and collection lines in nearly all ice and wind structural loading regions, through various air contaminants and lightning isochronic levels, tying into weak and strong power grids while meeting interconnection requirements, traversing geographical regions such as the Nevada desert, the mountainous terrain of Idaho, the wetlands of Texas, the farmland of Illinois, the swamps of Georgia and more."

Invenergy developed and financed "191 large-scale clean power projects in the United States and globally," "representing $47 billion in completed transactions." Sane detailed a recent project in Texas, where "Invenergy Renewables and its affiliate companies recently developed, constructed, and [are] currently operating a 27-mile transmission line" and an Invenergy project in Illinois where it completed construction of the Blooming Grove Wind Project in 2020. Sane also identified two HVDC transmission lines being developed by Invenergy Renewables and its affiliates. The New Mexico North Path is an infrastructure project advancing wind and solar energy, and Clean Path New York "is an $11B clean infrastructure project comprised of over 20 wind and solar generation projects *** and a new, 175-mile underground HVDC transmission line."

¶ 8        Sane also testified regarding the collective experience of the GBX management team, which "includes executive, professional and technical personnel who have managed, built and financed projects in the transmission, renewable and traditional energy sectors," and have "financed billions of dollars of energy projects and managed the development of projects that produce or transmit thousands of megawatts of power." In addition, Sane explained that "[m]embers of the management team have had management, engineering and other supervisory roles in the construction of transmission lines." Submitted with Sane's testimony was a listing setting forth the qualifications of Invenergy's management team.

¶ 9        Shine testified that she had "assisted with over $1 billion in construction, tax equity and preferred equity financing," and closed a "$650 million debt financing deal for the first liquified natural gas ('LNG')-to power project in El Salvador" and "managed construction funds through COVID impacts and identified and addressed working capital challenges arising from LNG market volatility and delays in revenue." In her role in a prior company, she "closed over 150 solar projects with

leading tax equity and debt players across the Unite[d] States and Spain" and "raised three funds of distributed generation assets and streamlined financing process by standardizing documentation and credit analysis" and "maximized project value by driving favorable terms on investor yield and lease terms." She also "provided structured financing solutions to United States and Canadian clients operating in the international markets related to hydropower, oil and gas, offshore drilling, LNG and mining" and "conducted underwriting analyses on sponsor credit, technology, offtake quality and market uncertainty." Submitted with Shine's testimony was an exhibit listing the 50 completed and current "Affiliate Developed and/or Constructed Generation and Transmission Facilities." Invenergy Transmission had, either in construction or in operation at the time of the ICC proceedings, more than "4000 miles of transmission and collection lines, 88 substations, 96 generator step-up transformers and 5323 pad mount transformers" and was developing two other high-voltage transmission line projects. Shine described a 2021 transmission project in Latin America consisting of a new transmission line, a substation, and accompanying infrastructure that was financed "through multilateral and private placement sources of funding" as an example of Invenergy's experience.

¶ 10        Shine and Sane explained the substantial history of capital markets supporting transmission projects. According to Shine, "significant amounts of liquidity exist in the capital markets for transmission projects that have reached an advanced stage of development," and "[n]umerous institutional lenders and investors have provided capital to transmission projects and other infrastructure projects and demonstrate continued interest in this sector." Sane explained the growing demand for renewable energy sources, particularly "wind and solar generation, in Illinois," and anticipated the "demand will continue to grow over the next 20-30 years." Shine and Sane provided evidence regarding the benefits of and market demand for the transmission service capacity that the project would offer. After soliciting customers for an earlier version of this project, GBX received communications from 14 wind developers from 26 wind farms around the proposed converter station in Kansas, and 14 shippers requested transmission service capacity. Both Sane and Shine testified GBX met the statutory requirement of section 8-406.1(f)(3) of the Act (220 ILCS 5/8-406.1(f)(3) (West 2022)).

¶ 11　　The ICC's staff witness, Michael McNally, provided testimony. He was a senior financial analyst in the finance department of the ICC's financial analysis division. He and the ICC staff recommended a revised financing condition requiring GBX to obtain financial commitments for the entire project before it began construction on any easement property in Illinois. This condition differed from the one offered by GBX, whereby it agreed to obtain financing for only the Illinois phase of the project before beginning any construction. McNally explained the revised financing condition would prevent the risk of significant adverse financial consequences for GBX or its customers if the company was forced to abandon the project. In that circumstance, only the investors would suffer. McNally described GBX's current financials as irrelevant to the statutory requirement in section 8-406.1(f)(3) (*id.*) because the revised financial condition was forward-looking and would be based on anticipated customer contracts GBX would seek at an advanced stage of project development. He did not know if there would be an additional hearing when GBX provided its compliance documents to the ICC.

¶ 12　　The ICC issued the CPCN, finding that GBX was a qualifying applicant and the project was a qualifying project under section 8-406(b-5), that the section 8-406(b-5) qualification satisfied the criteria under section 8-406.1(f)(1), and that GBX was "capable of financing" the project without significant adverse financial consequences for GBX or its customers. See *Grain Belt Express LLC*, Ill. Comm. Comm'n No. 22-0499 (Order-Final Mar. 8, 2023), https://www.icc.illinois.gov/docket/P2022-0499/documents/334872/files/583350.pdf [https://perma.cc/4CHD-H5PL]; see also 220 ILCS 5/8-406(b-5), 8-406.1(f)(1), (3) (West 2022). It considered the project finance method to be commonly used in the energy infrastructure industry and reviewed GBX's capitalization, experience, and financial relationships. *Grain Belt Express*, Ill. Comm. Comm'n No. 22-0499, at 49. The ICC concluded that there would be sufficient transmission contracts to support the financing and that the revised financing condition would protect Illinoisans. *Id.* It noted GBX agreed it would not allocate the costs of project construction and operation to Illinois ratepayers without ICC approval and that the evidence did not show any permanent adverse effect on property values along the transmission line. *Id.* at 50, 86. The ICC further determined that GBX sought a CPCN under section 8-406(b-5) and did not need to request authorization under section 8-406(a), that the grant of a CPCN under section 8-406.1(i) requires the ICC to also authorize construction under section 8-503, and that a finding the

- 6 -

project satisfies section 8-406.1(f)(1)-(3) is a finding that it promotes the public convenience and necessity. *Id.* at 11, 25, 91; see 220 ILCS 5/8-406(a), (b-5), 8-406.1(i), 8-503, 8-406.1(f)(1)-(3) (West 2022). The ICC did not address the constitutional claims Concerned Citizens raised, including whether the statute violated the special legislation, equal protection, and separation of powers clauses of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IV, § 13; *id.* art. I, § 2; *id.* art. II, § 1). *Grain Belt Express*, Ill. Comm. Comm'n No. 22-0499, at 21.

¶ 13        Concerned Citizens sought direct administrative review in the appellate court of its statutory and constitutional claims and the issuance of the certificate. The appellate court reversed the ICC's order, finding that GBX did not establish the requirement that it is capable of financing the project without significant adverse financial consequences for itself or its customers (220 ILCS 5/8-406.1(f)(3) (West 2022)). 2024 IL App (5th) 230271-U, ¶ 38. The appellate court considered the industry's project finance method to be "speculative financing" and concluded that the revised financing condition demonstrated GBX's inadequate showing that it could finance the project. *Id.* ¶¶ 29, 35. The court determined that neither GBX nor its parent company, Invenergy Renewables, presented any evidence of their "financial health." *Id.* ¶ 31. It also determined that section 8-406.1(f)(3)'s requirement that an applicant be "capable of financing" the project was a condition precedent to the issuance of a certificate, necessitating that GBX establish it could finance the project at the time ICC would grant an application for a CPCN. *Id.* ¶ 28. The appellate court did not address Concerned Citizens' other statutory claims, including whether the ICC lacked authority to impose the cost allocation condition and a 60-month construction deadline.

¶ 14        GBX and the ICC both petitioned for leave to appeal to this court. GBX argued that the appellate court's decision will make it impossible for any renewable energy project to be approved, contrary to the state's energy goals, and that it upends the industry financing norms. The ICC argued that the appellate court misinterpreted sections 8-406(b-5) and 8-406.1(f)(3) of the Act (220 ILCS 5/8-406(b-5), 8-406.1(f)(3) (West 2022)) and improperly reweighed the evidence of whether GBX is capable of financing the project with significant adverse financing consequences for GBX or its customers, substituting its conclusion for that of the ICC. We granted the petitions for leave to appeal and consolidated the appeals. The following parties filed *amicus* briefs in support of GBX: the AFL-CIO; the Illinois Chamber of

- 7 -

Commerce; the Illinois Manufacturers' Association and the Electricity Consumers Resource Council; the Clean Grid Alliance and the American Clean Power Association; and the Natural Resources Defense Council, the Environmental Law and Policy Center, Sierra Club, and CUB. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 15                                    ANALYSIS

¶ 16         The issue in this appeal is the interpretation of section 8-406.1(f)(3) of the Act, which requires that an applicant be "capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers." 220 ILCS 5/8-406.1(f)(3) (West 2022). GBX argues that section 8-406.1(f)(3) (*id.*) does not establish a condition precedent to the issuance of a CPCN, contrary to the finding of the appellate court, and that it presented sufficient evidence to satisfy the requirement. The ICC maintains that its conclusion that GBX is capable of financing the project without significant adverse financial consequences for GBX or its customers was consistent with the Act and supported by substantial evidence. Concerned Citizens argues that GBX failed to present any evidence it could currently finance the project at the time it was granted the certificate. It interprets section 8-406.1(f)(3) (*id.*) as necessitating that GBX establish financing in place when the certificate issues and that GBX did not show current and present financing and also failed to present any evidence it had capability of financing the project at any time.

¶ 17         When we review an administrative decision, we look at the final judgment of the administrative agency and not the appellate court judgment. *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2017 IL 121302, ¶ 29. The Act provides that ICC's factual findings "shall be held prima facie to be true" and its orders and decisions "shall be held to be prima facie reasonable." 220 ILCS 5/10-201(d) (West 2022). A court will reverse an ICC order when the ICC's findings are " 'not supported by substantial evidence based on the entire record of evidence.' " *Landowners Alliance*, 2017 IL 121302, ¶ 29 (quoting 220 ILCS 5/10-201(e)(iv)(A) (West 2014)). Courts are not bound by the ICC's rulings on questions of law. *Id.* Rather, we review an agency's interpretation of an unambiguous statute *de novo*. *Id.*

¶ 18    To resolve this appeal, we interpret the Act, the statute at issue. Section 8-406(b-5) of the Act was enacted as part of Public Act 102-0662 (eff. Sept. 15, 2021), commonly known as the Climate and Equitable Jobs Act, and authorizes a "qualifying direct current applicant" to apply for and obtain a CPCN to construct a "qualifying direct current project" without owning any physical plant, equipment, or property in Illinois at the time of the application. 220 ILCS 5/8-406(b-5) (West 2022). The statutory amendment was the legislature's response to this court's decision in *Landowners Alliance*, 2017 IL 121302, ¶ 1, where we found the ICC had no authority to review Rock Island Clean Line's application for a CPCN because "the company did not qualify as a public utility under Illinois law." The amendment also addressed a subsequent decision, *Concerned Citizens & Property Owners v. Illinois Commerce Comm'n*, 2018 IL App (5th) 150551, ¶ 24, where the appellate court found that, because GBX was not a public utility, the ICC erred when it issued it a CPCN for a transmission line project similar to the one at issue and that the ICC lacked authority to grant it to GBX.

¶ 19    As the ICC found, under section 8-406(b-5), GBX is a "qualifying direct current applicant," and its project is a "qualifying direct current project." *Grain Belt Express*, Ill. Comm. Comm'n No. 22-0499, at 21; see 220 ILCS 5/8-406(b-5) (West 2022). A " '[q]ualifying direct current applicant' " is "an entity that seeks to provide direct current bulk transmission service for the purpose of transporting electric energy in interstate commerce." 220 ILCS 5/8-406(b-5) (West 2022). A " '[q]ualifying direct current project' " is

"a high voltage direct current electric service line that crosses at least one Illinois border, the Illinois portion of which is physically located within the region of the Midcontinent Independent System Operator, Inc., or its successor organization, and runs through the counties of Pike, Scott, Greene, Macoupin, Montgomery, Christian, Shelby, Cumberland, and Clark, is capable of transmitting electricity at voltages of 345 kilovolts or above, and may also include associated interconnected alternating current interconnection facilities in this State that are part of the proposed project and reasonably necessary to connect the project with other portions of the grid." *Id.*

Section 8-604(b-5) further provides, in pertinent part:

"Notwithstanding any other provision of this Act, a qualifying direct current applicant that does not own, control, operate, or manage, within this State, any plant, equipment, or property used or to be used for the transmission of electricity at the time of its application or of the Commission's order may file an application on or before December 31, 2023 with the Commission pursuant to this Section or Section 8-406.1 for, and the Commission may grant, a certificate of public convenience and necessity to construct, operate, and maintain a qualifying direct current project. *** If the qualifying direct current applicant demonstrates in its application that the proposed qualifying direct current project is designed to deliver electricity to a point or points on the electric transmission grid in either or both the PJM Interconnection, LLC or the Midcontinent Independent System Operator, Inc., or their respective successor organizations, the proposed qualifying direct current project shall be deemed to be, and the Commission shall find it to be, for public use." *Id.*

¶ 20        Section 8-406.1 provides for an expedited process to obtain a CPCN. *Id.* § 8-406.1. It sets forth the requirements, in relevant part, as follows:

"(f) The Commission shall, after notice and hearing, grant a certificate of public convenience and necessity filed in accordance with the requirements of this Section if, based upon the application filed with the Commission and the evidentiary record, it finds the Project will promote the public convenience and necessity and that all of the following criteria are satisfied:

* * *

(3) That the public utility is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers." *Id.* § 8-406.1(f)(3).

¶ 21        Section 8-406.1(f)(3) requires an applicant to demonstrate it "is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers." *Id.* As stated above, GBX construes the requirement as forward-looking, while Concerned Citizens maintains the requirement necessitates GBX establish its current capability to finance the project prior to issuance of the CPCN. To resolve this dispute, we employ the rules of statutory interpretation. When interpreting a statute, the court's primary goal is to

give effect to the legislature's intent, giving the language of the statute its plain and ordinary meaning. *People ex rel. Madigan v. Wildermuth*, 2017 IL 120763, ¶ 17. We apply the statute as written without looking to any aids of statutory construction when its language is plain and unambiguous. *Goodman v. Ward*, 241 Ill. 2d 398, 408 (2011). When a word is undefined in a statute, we may look to common usage as found in the dictionary. *Carmichael v. Laborers' & Retirement Board Employees' Annuity & Benefit Fund of Chicago*, 2018 IL 122793, ¶ 56 ("When a statute fails to define a term, it is entirely appropriate to look to the dictionary to ascertain the meaning of the term.").

¶ 22        "Capable" is defined as "having attributes (such as physical or mental power) required for performance or accomplishment," "having traits conducive to or features permitting something," and "having or showing general efficiency and ability." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/capable (last visited Dec. 23, 2025) [https://perma.cc/VYR2-E8TH]. Affording the language "is capable of" its plain and ordinary meaning, GBX must have the capacity, power, or fitness to finance the project; the traits conducive to or features permitting the project financing; and has shown or can show the general efficiency and ability to finance the project. The language does not require GBX to demonstrate it could finance its project at the time of its application as a condition precedent to obtain approval for it from the ICC. Such an interpretation inserts an additional requirement, "at the time of its application," into the statute, violating the rules of interpretation. See *Mosby v. Ingalls Memorial Hospital*, 2023 IL 129081, ¶ 31 ("When the statutory language is plain and unambiguous, a court may not 'depart from a statute's plain language by reading into the law exceptions, limitations, or conditions that the legislature did not express.' " (quoting *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 408 (2010))). Simply put, section 8-406.1(f)(3) (220 ILCS 5/8-406.1(f)(3) (West 2022)) is devoid of any language requiring a utility seeking a CPCN to establish proof of current and present financial funding or funds in escrow prior to the issuance of a CPCN. Rather, the legislature's use of the broad language, "is capable of financing the proposed construction without significant adverse financial consequences," evinces that it intended an expansive interpretation of section 8-406.1(f)(3). See *id.*; see also *Cassidy v. China Vitamins, LLC*, 2018 IL 122873, ¶ 28 (rejecting "a cramped interpretation of the intentionally broad language" of a statute). Had the legislature intended that applicants have financing in place at the time the CPCN was to issue, it would have

put such a requirement into the statute. See *People v. Hoffman*, 2025 IL 130344, ¶ 57 (O'Brien, J., dissenting, joined by Neville and Rochford, JJ.) ("Importantly, it is the statutory text that best reflects the legislature's intent."); *Chatham Foot Specialists, P.C. v. Health Care Service Corp.*, 216 Ill. 2d 366, 398 (2005) (legislature would have expressed the requirement had it intended to include it in the statute). There is no temporal limitation in the statutory language.

¶ 23    The ICC therefore correctly rejected Concerned Citizens' narrow interpretation that GBX was required to establish it could finance the project "at present." *Grain Belt Express*, Ill. Comm. Comm'n No. 22-0499, at 45. In doing so, the ICC also specifically noted that Concerned Citizens' construction of the phrase " 'is capable of financing' " ignores the remaining plain language of section 8-406.1(f)(3), which states, " '*without significant adverse financial consequences for the utility or its customers*.' " (Emphasis added.) *Id.* at 49 (quoting 220 ILCS 5/8-406.1(f)(3) (West 2022)). Concerned Citizens advocates for a two-step interpretation of the statutory requirement: that the utility be capable of financing the proposed construction and that, only if that requirement is satisfied, will the existence of any significant adverse financial consequences be considered. Concerned Citizens' approach and interpretation fail to consider the statute as a whole, contrary to what the interpretative rules direct. ICC's McNally acknowledged that Concerned Citizens interprets the statute that way but stated that the ICC considers section 8-406.1(f)(3) to be one requirement read as a whole. The interpretation offered by Concerned Citizens fails to construe section 8-406.1(f)(3) according to its plain and unambiguous language, which sets forth one requirement, not a two-step process. The narrow interpretation presented by Concerned Citizens would require all projects to have full financing in place at the time a utility applied for permits. Because customers will not sign on with a utility until it has obtained regulatory approvals, the narrow interpretation presented by Concerned Citizens would essentially stall all future energy projects and eliminate the opportunity for Illinois to reach its clean energy goals. This outcome is not what the legislature intended.

¶ 24    "The Public Utilities Act was enacted to assure the provision of efficient and adequate utility service to the public at a reasonable cost." *Zahn v. North American Power & Gas, LLC*, 2016 IL 120526, ¶ 17. As part of the Climate and Equitable Jobs Act, section 8-406(b-5) (220 ILCS 5/8-406(b-5) (West 2022)) was added to the Act to address the need for increased availability of renewable energies,

including electricity generated by wind farms. See, *e.g.*, *id.* § 8-512(b)(2) (state's renewable energy access plan "shall *** develop a plan to achieve transmission capacity necessary to deliver the electric output from renewable energy technologies" to Illinois customers). Section 8-406(b-5) allows GBX, a nonpublic utility, to step into the shoes of a public utility to construct a transmission line to provide access to cleaner, cheaper, and more reliable electricity for Illinois residents. See Pub. Act 102-662 (eff. Sept. 15, 2021). Because of the need to advance renewable energy to meet our state's goals to convert to renewable energy to satisfy our electricity demands, section 8-406.1 presents an expedited process for issuance of a CPCN. See 220 ILCS 5/8-406.1 (West 2022).

¶ 25     The ICC's correct interpretation of the plain and unambiguous language, "is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers," not only aligns with the Act but also with the legislature's express commitment to reduce the state's dependency on fossil fuels and move to renewable energies. See 50 ILCS 65/15-5(1) (West 2022) ("The health, welfare, and prosperity of Illinois residents require that Illinois take all steps possible to combat climate change, address harmful environmental impacts deriving from the generation of electricity, maximize quality job creation in the emerging clean energy economy, [and] ensure affordable utility service ***."). Moreover, it allows energy providers and energy transmission providers to obtain permits and begin construction of energy projects based on their future capability to raise capital, which expands the field of potential energy projects and acknowledges the energy industry's use of the project finance model to fund these large-scale investments. GBX's Sane and Shine explained that, under this method, it is only after a project reaches an advanced stage of development that a developer such as GBX will execute project-specific financing arrangements with investors and lenders to acquire the capital to secure financing to complete development and construction. Investors in these types of projects prefer the developers such as GBX to have all necessary permits, other financial commitments, and a high degree of certainty on the project's budget and timeline before they will invest. Such a method reflects the unique balance between the industry's model of obtaining future financing and ensuring a utility will be able to complete a proposed project. See *Rock Island Clean Line LLC*, Ill. Comm. Comm'n No. 12-0560, at 150 (Order-Final Nov. 25, 2014), https://www.icc.illinois.gov/docket/P2012-0560/documents/221967/files/391921.pdf [https://perma.cc/6A5N-UUUB] (rejecting the

- 13 -

challengers' argument that section 8-406.1 required the applicant for a CPCN to have financing secured at the time of the application). Lastly, we emphasize that a revised financing condition was included in the instant CPCN that requires GBX to secure financing for the entire project before beginning any construction on easement properties in Illinois. Accordingly, we find that the ICC's determination that GBX was not required to demonstrate a current and present ability to finance its proposed project at the time the ICC issues the CPCN is consistent with the plain and unambiguous language of section 8-406.1(f)(3) (220 ILCS 5/8-406.1(f)(3) (West 2022)) and the overall intent of the Act.[1]

¶ 26      With the above understanding in mind, we now turn to the factual question of whether GBX established that it is capable of financing the proposed construction without significant adverse financial consequences for it or its customers. To satisfy section 8-406.1(f)(3)'s plain and unambiguous statutory requirement, GBX had to demonstrate to the ICC that it (1) is capable of financing the proposed construction—that is, it has the ability to finance the project—and (2) that such capability to finance the project will not result in significant adverse financial consequences to GBX or its customers. The ICC found that GBX satisfied both statutory requirements. *Grain Belt Express*, Ill. Comm. Comm'n No. 22-0499, at 49. The appellate court subsequently reversed this finding. 2024 IL App (5th) 230271-U, ¶ 42. The ICC and GBX argue that the appellate court improperly reweighed the evidence and substituted its judgment of that of the ICC. They maintain that the ICC's ruling was supported by substantial evidence and should be affirmed. Concerned Citizens counters that GBX failed to present any evidence of its financial capability and that the ICC merely took GBX at its word that it will secure the necessary financing to complete the project in the future.

¶ 27      To determine whether the ICC correctly found that GBX demonstrated that it is capable of financing the proposed construction without significant adverse

---

[1]We offer no opinion on the analysis or holdings found in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). The *Loper Bright* Court held that, under the federal Administrative Procedure Act (5 U.S.C. 500 *et seq.* (2024)), courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous" *Loper Bright*, 603 U.S. at 413. None of the parties here argue that section 8-406.1 is ambiguous, and our interpretation of the statute is based on its plain and unambiguous language. Because the statute in question is not ambiguous, *Loper Bright* has no bearing on this appeal.

financial consequences, we review the evidence submitted to the ICC. We will only reverse an ICC order if we conclude that the ICC's findings are not supported by substantial evidence based on the entire record of evidence submitted to the ICC. *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 120-21 (1995). "Substantial evidence exists if a reasoning mind would accept the evidence as sufficient to support the challenged finding; it consists of more than a mere scintilla of evidence but may be less than a preponderance of the evidence." *City of Elgin v. Illinois Commerce Comm'n*, 2016 IL App (2d) 150047, ¶ 25. A reversal of an ICC order is not appropriate on a mere "showing that the evidence may support a different conclusion; it must be shown that the opposite conclusion is clearly evident." *Continental Mobile Telephone Co. v. Illinois Commerce Comm'n*, 269 Ill. App. 3d 161, 171 (1994).

¶ 28 Upon review, we find GBX presented substantial evidence in support that it "is capable of financing the proposed construction without significant adverse financial consequences" for itself or its customers. This evidence was presented by Sane, GBX's and Invenergy's vice president of transmission, and Shine, Invenergy's finance director, who both testified to Invenergy's experience in financing similar transmission line projects, its skilled management team and established relationships with commercial lenders, and interest in the project and the renewable energy industry. Shine and Sane testified that the project finance method is commonly used in the energy sector to fund large scale projects, that Shine had assisted with more than $1 billion in construction financing, and that Sane had been involved in construction financings totaling approximately $5 billion. Shine and Sane further testified that the lenders prefer that developers such as GBX have the necessary permits, any needed additional financing, and certainty on time and budget before undertaking financing obligations. When the energy project reaches an advanced stage of development, GBX will enter into project-specific financing agreements to secure financing to complete the project. Until that stage of project development is reached, Invenergy Renewables will continue to finance the project, adding to the $60 million it has already invested. As the project is further developed, GBX will be able to secure customer contracts to serve as collateral for financing from lenders with whom Invenergy has established relationships. GBX received responses from its request for interest in the project from 14 wind farm developers and 14 energy shippers seeking transmission service capacity, which supports its ability to obtain customers whose contracts would

serve as collateral for commercial loans as the ICC concluded. We find the record contains substantial evidence that GBX is capable of funding the project.

¶ 29    While GBX did not present any financial information of GBX and Invenergy, we note that the plain and unambiguous language found in section 8-406.1(f)(3) does not specify what type of evidence needs to be presented to establish whether a utility is capable of financing a project without significant adverse financial consequences to itself and its customers. Sane and Shine both described the numerous energy projects in which their companies had been involved globally, including $47 billion in completed energy transactions in the United States alone. Importantly, the ICC's McNally testified that, because of the nature of the industry's project finance model, the current financial information of GBX and Invenergy was irrelevant. Based on his review of GBX's application, McNally expressly recommended that the ICC find, "conditioned on the imposition of the Revised Financing Condition, that Grain Belt Express is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers." McNally noted that the ICC had used the same financing condition in *Rock Island Clean Line*, requiring it to provide proof of financing to construct the entirety of the project before beginning any construction in Illinois. *Rock Island Clean Line*, Ill. Comm. Comm'n No. 12-0560, at 139-40. It also approved the same financing condition in *Grain Belt Express Clean Line LLC*, Ill. Comm. Comm'n No. 15-0277, at 146 (Order-Final Nov. 12, 2015), https://www. icc.illinois.gov/docket/P2015-0277/documents/236482/files/417411.pdf [https:// perma.cc/M53Y-QSX9], *rev'd on other grounds by Concerned Citizens*, 2018 IL App (5th) 150551.

¶ 30    In addition to requiring funding for the entirety of the project before construction begins on any easement property in Illinois, the revised financing condition requires that GBX provide ICC with the following documents to "verify its compliance" with the condition:

> "(a) On a confidential basis, documents sufficient to demonstrate equity and loan or other debt financing agreements and commitments entered into or obtained by Grain Belt Express or its parent company for the purpose of funding the Project that, in the aggregate, provide commitments for funds for the total project cost;

(b) An attestation certified by an officer of Grain Belt Express that Grain Belt Express has not, prior to the date of the attestation, installed Phase II transmission facilities on easement property; or a notification that such installation is scheduled to begin on a specified date;

(c) A statement of the total project cost, broken out by the components listed in the definition of 'total project cost,' above, and reviewed by an officer of Grain Belt Express, along with a reconciliation of the total project cost in the statement to the total project cost as of July 18, 2022 of $4.95 billion (not including estimated costs for network upgrades); and

(d) A reconciliation statement, certified by an officer of Grain Belt Express, showing that the agreements and commitments for funds provided in (a) are equal to or greater than the total project cost provided in (c)." *Grain Belt Express LLC*, Ill. Comm. Comm'n No. 22-0499 (Appendix B Mar. 8, 2023), https://www.icc.illinois.gov/docket/P2022-0499/documents/334872/files/583352.pdf [https://perma.cc/S4DQ-5A65].

The revised financing condition necessitates GBX present to the ICC specific documents confirming that GBX is able to pay for the entire project before it begins any construction in Illinois on easement property. Thus, the record contains substantial evidence that GBX and its customers are protected from significant adverse financial consequences, as construction cannot begin until GBX has enough money to finish the project. Accordingly, we find that the evidence within the record supports the ICC's decision to issue GBX a CPCN under the expedited process set out in section 8-406.1 (220 ILCS 5/8-406.1 (West 2022)) of the Act. See *id.* § 10-201(e)(iv)(A) (ICC order should be reversed when "not supported by substantial evidence"); *Landowners Alliance*, 2017 IL 121302, ¶ 29 (same).

¶ 31    In coming to this conclusion, we find that the appellate court improperly rejected Sane and Shine's testimony. The appellate court's findings disregard the evidence presented before the ICC. The court's reweighing of the evidence and substituting its conclusions for those of the ICC were contrary to the canons of statutory construction. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 210 (1991) ("This court will not substitute its judgment for that of the Commission where, as here, it has made an evidentiary determination supported by the record."). Again, we find that GBX

presented substantial evidence that it was "capable of financing the proposed construction without significant adverse financial consequences" for itself or its customers. The appellate court erred in finding it did not.

¶ 32　　　　Likewise, we reject Concerned Citizens' claim that the ICC has traditionally required applicants to present sufficient financial documentation to satisfy the statutory requirements, as the cases on which it relies are distinguished on their facts. Those applicants were existing public utilities with physical plant and infrastructure already present in the state. See *Ameren Illinois Co.*, Ill. Comm. Comm'n No. 13-0115 (Order-Final Sept. 4, 2013), https://www.icc.illinois.gov/docket/P2013-0115/documents/202655/files/357013.pdf [https://perma.cc/64YA-QE43] (application to construct, operate, and maintain an electrical transmission line connecting an existing substation and transmission line); *Ameren Illinois Co.*, Ill. Comm. Comm'n No. 15-0064 (Order-Final June 16, 2015), https://www.icc.illinois.gov/docket/P2015-0064/documents/230963/files/407594.pdf [https://perma.cc/D3BW-AL9V] (application to construct electric transmission lines to connect an existing substation to new substation to be constructed); *Ameren Transmission Co.*, Ill. Comm. Comm'n No. 15-0278 (Order-Final Nov. 12, 2015), https://www.icc.illinois.gov/docket/P2015-0278/documents/236531/files/417496.pdf [https://perma.cc/H6HW-7ZMT] (application to connect portions of existing electric transmission line); *American Transmission Co.*, Ill. Comm. Comm'n No. 16-0412 (Order-Final Dec. 20, 2016), https://www.icc.illinois.gov/docket/P2016-0412/documents/249152/files/439648.pdf [https://perma.cc/KUF4-DFJK] (application for electric transmission line to connect with transmission facilities already operating in Illinois); *Aqua Illinois, Inc.*, Ill. Comm. Comm'n No. 22-0336 (Order-Final Dec. 15, 2022), https://www.icc.illinois.gov/docket/P2022-0336/documents/331604/files/577211.pdf [https://perma.cc/443C-6TU8] (application for water distribution system and wastewater collection system in expanded development; applicant is public utility providing water and sewer service). The projects were paid for with traditional financing methods and relied on the existing resources of the applicant or its parent company. See *Ameren Illinois*, Ill. Comm. Comm'n No. 13-0115, at 14 (short-term and long-term debt, equity supported by cash flow, and liquidity from parent company); *Ameren Illinois*, Ill. Comm. Comm'n No. 15-0064, at 11 (short-term debt, long-term debt, and equity; retained earnings; and equity infusions from parent company); *Ameren Transmission*, Ill. Comm. Comm'n No. 15-0278, at 7-8 (parent corporation, intercompany borrowing

arrangement, and retained earnings); *American Transmission*, Ill. Comm. Comm'n No. 16-0412, at 4-6 (debt and internal earnings); *Aqua Illinois*, Ill. Comm. Comm'n No. 22-0336, at 6 (day-to-day working capital, available bank lines of credit). In contrast, GBX is a public utility only by legislative fiat, and unlike the above applicants, the ratepayers will not contribute to the construction costs. In the emerging renewables energy industry, infrastructure projects are not financed based on current financial capability but on future revenues that will be generated from customers paying for transmission line capacity. GBX is not a traditional public electricity utility like the utilities involved in the ICC cases cited by Concerned Citizens. Moreover, as we explained above, section 8-406.1(f)(3) does not specify what type of evidence a utility must present to satisfy the section's plain and unambiguous statutory requirements.

¶ 33    We find the record presents substantial evidence supporting the ICC's finding that GBX "is capable of financing the project without significant adverse financial consequences" to it or its customers and that the revised financing condition ensures that GBX will not begin construction until it can pay for the entire project. Proof of GBX's current and present financial capability was not a condition precedent to the issuance of the CPCN. Instead, evidence of the industry's method of financing the construction of large-scale energy projects, along with unrefuted evidence that such projects do not generate revenue until regulatory permits are issued and customer contracts are executed, supports the ICC's decision to issue a CPCN to GBX.

¶ 34    Lastly, we decline to address any of the constitutional and other statutory issues raised below. None of these arguments were addressed by the appellate court. Our decision is therefore limited to the question before us, whether the record contains substantial evidence supporting the ICC's decision to issue GBX a CPCN under section 8-406.1(f)(3) of the Act (220 ILCS 5/8-406.1(f)(3) (West 2022)).

¶ 35                              CONCLUSION

¶ 36    For the foregoing reasons, we reverse the appellate court's order reversing the ICC's grant of a CPCN to GBX. We remand this matter to the appellate court. See *People v. Lantz*, 186 Ill. 2d 243, 262 (1999) ("[T]he appropriate procedure generally is to remand the matter to the appellate court so that previously

unaddressed issues may be considered there first.").

¶ 37        Appellate court judgment reversed.

¶ 38        Commission decision affirmed.

¶ 39        Cause remanded.

¶ 40        JUSTICE HOLDER WHITE took no part in the consideration or decision of this case.